UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

| | |
|---|---|
| In re: | CASE NO. 10-32093 |
| Pacific Avenue, LLC, et al.,[1] | CHAPTER 11 |
| Debtors. | Jointly Administered |

**DEBTORS' RESPONSE TO MOTION OF BLUE AIR 2010 LLC FOR ORDER TO APPOINT A CHAPTER 11 TRUSTEE FOR LIMITED PURPOSES**

Pacific Avenue, LLC ("Pacific"), and Pacific Avenue II, LLC, the debtors herein (the "Debtors"), through counsel, hereby bring their *Debtors' Response to Motion of Blue Air 2010 LLC for Order to Appoint a Chapter 11 Trustee for Limited Purposes,* and respectfully represent as follows:

## BACKGROUND

1. On July 22, 2010, the Debtors filed their voluntary petitions pursuant to chapter 11 of the Bankruptcy Code.

2. On November 23, 2010, Blue Air 2010, LLC ("Blue Air") filed its *Notice of Assignment of Claim* with respect to its purchase of the Debtors' obligations to Regions Bank, the Debtors' pre-petition lender. (D.E. 203). Before taking assignment from Regions Bank, Blue Air performed its own due diligence (the "Due Diligence Period").

3. On March 25, 2011, with the full support of Blue Air, the Debtors filed their proposed chapter 11 plan (the "Plan"). (D.E. 270). Blue Air actively participated in developing the Plan, which contemplates that Blue Air will assume control of the Debtors' property, the "EpiCentre." Blue Air voted in favor of the Plan on July 18, 2011.

---

[1] These jointly administered cases are those of the following debtors: Pacific Avenue, LLC and Pacific Avenue II, LLC, Case numbers 110-32093 and 10-32095 respectively.

4.      Blue Air has since withdrawn its support of the Plan it was so instrumental in drafting. Demonstrating this dramatic shift in position, on Sunday, October 23, Blue Air filed a number of pleadings (collectively, the "Blue Air Pleadings") and requested that those matters be heard on shortened notice on Monday morning, October 24, 2011.

5.      At the October 24, 2011 hearing, the Court declined to hear the Blue Air Pleadings and continued the hearings set for that date to Thursday, October 27, 2011, at 10 a.m. In doing so, the Court noted that the Debtors' due process rights demanded postponing the hearings on the Blue Air Pleadings and that, in any event, Blue Air had arranged for the management company of its choice to take over the Debtors' books from the previous management company.[2] In the interim, the Debtors and their counsel were enjoined from taking any actions that would disturb the status quo. Order (D.E. 539).

6.      Among the Blue Air Pleadings was the *Motion of Blue Air 2010 LLC for Order to Appoint a Chapter 11 Trustee for Limited Purposes* (the "Trustee Motion") (D.E. 519). Blue Air claims that the Trustee Motion is supported by cause based on several meritless allegations. Taking Blue Air's allegations in turn, the Debtors respond as follows:

- Blue Air's allegations that pre-petition, Afshin Ghazi ("Ghazi") caused the Debtors and Lincoln Harris to "alter the Debtors' books and records" with respect to alleged receivables due from EpiCentre Theater Partners (the "Theater") and to "hide" the Theater's payment obligations to the Debtors by substituting back-dated lease agreements are without merit. The Theater lease was, in fact, replaced with the true and correct lease pre-petition. The theater at the EpiCentre has five screens. Yet, a cursory review of the earlier Theater lease that is the subject of Blue Air's allegations

---

[2]     On August 22, 2011, the Court entered an Order approving Jones Lang LaSalle Americas, Inc. ("JLL") to replace the Debtors' former management company, Lincoln Harris LLC ("Lincoln Harris"). (D.E. 451).

2

reveals that it provides for a 10-screen theater and, therefore, could not possibly be correct. Pre-petition adjustments were made to the Debtors' books relative to back rent due from several tenants, including the Theater, in response to the precipitous decline in the economy during the 2008-2009 timeframe. During the Due Diligence Period, Blue Air was fully apprised of the correct 2007 Theater lease terms and the water leaks in the roof over the Theater.[3] In fact, when it created its underwriting model prior to closing with Regions Bank, Blue Air calculated that no rent revenue would be received from the Theater until a future date. Moreover, after thoroughly underwriting the business issues, Blue Air gave its explicit approval and support to a reduction in total rents for the Theater, which were needed to ensure the Theater's viability as a paying tenant, resulting in a lease amendment reducing total rents as well as further deferring the time period before which the Theater would be required to begin paying rents.

- Blue Air's allegations that pre-petition, Ghazi instructed a third party to pay advertising revenues to the Theater instead of to the Debtors and that this transfer was not disclosed do not support appointment of a trustee. The Debtors terminated a marketing agreement with Adams Outdoor Advertising Limited Partnership ("Adams") pre-petition. Future advertising revenues were then directed to the Theater. However, no such revenue checks were cashed, and no funds from Adams were transferred to the Theater. Further, Blue Air's attorneys were actively involved from at least as early as June 13, 2011 in negotiating a settlement with Adams. On October 23, 2011, the Debtors filed a motion to approve that settlement. (D.E. 517).

---

[3] Other tenants, including Novant Medical Group, f/k/a Presbyterian Regional Healthcare Corp., also received rent adjustments based on the leaky roof. Upon information and belief, Blue Air is moving forward with replacing the section of the EpiCentre roof over the Theater as of this writing.

- Nor is the Trustee Motion supported by Blue Air's allegations that the Debtors "concealed" a lease with Sunset Management Company, LLC ("Sunset"), the on-site manger of the EpiCentre, and "concealed" the existence of un-cashed rent checks received by Sunset from Sunset's sub-tenant. Sunset previously served as the on-site manager of the EpiCentre. Accordingly, the cost of the office space that Sunset occupied at the EpiCentre was a necessary part of common area maintenance ("CAM") expenses. As between the Debtors and Sunset, any rent charges were irrelevant—the economic value of that space was recoverable through CAM charges—a standard arrangement in the property management industry. If Sunset had paid rent, it would have been able to bill its client—the Debtors—for reimbursement of its rent expense given that Sunset's rent expense would have been incurred in managing the Debtors' property. Further, Blue Air included in its pre-closing underwriting model reference to the management office space with the assumption that no rent would be paid. With respect to any "concealed" un-cashed rent checks received by Sunset from Sunset's sub-tenant, Adams, according to Blue Air, the funds reflected in those checks have not been transferred.
- Blue Air's allegations that the Debtors "concealed" payments from the operator of a hot dog stand at the EpiCentre are baseless. Blue Air has been aware of this kiosk lease since March, 2011. Indeed, the $500 monthly income from that lease has been reported to Blue Air on the Debtors' cash receipts report since April, 2011.

*See* Trustee Motion at 3-4.

7. Most of what Blue Air complains of occurred pre-petition. Other issues, such as the payments due from Adams, have not only been known to Blue Air but actually settled with

4

the active involvement of Blue Air's attorneys. In sum, the Trustee Motion is not supported by facts that show cause for the appointment of a trustee. Nor do the alleged misdoings that Blue Air cites mandate what amounts to an emergency appointment of a trustee at this juncture in the case.

8. Blue Air is not in a position to complain about the Debtors' actions in this case. After the Debtors filed their Plan, Blue Air was careful to give the appearance of working together with the Debtors toward confirmation. This lead-up to confirmation involved regular, ongoing meetings between the principals of Blue Air and the Debtors' principals to discuss and agree to certain business decisions related to construction issues, leasing issues and the like. Thus, Blue Air and the Debtors worked together in a collaborative relationship on all aspects of the Debtors' operations.

9. During this period, the Debtors and their principals provided invaluable assistance in improving the EpiCentre. The Debtors obtained permanent certificates of occupancy for the EpiCentre—key to the marketability of the property; entered into new lease agreements approved by Blue Air; arranged for construction and upfit work; and under the direction of Blue Air, hired a new property management firm. Further, the Debtors arranged for the assignment of $1.1 million due to EPF College Street, LLC from the City of Charlotte, referenced in the Plan as the Plan Funds, which funds are currently being held in trust by Debtors' counsel.

10. At some unknown time, Blue Air developed a secret agenda, however. Under that agenda, Blue Air also was proceeding down a path toward litigation in a scheme to take ownership and control of all of the Debtors' assets as well as assets owned by the Debtors' principals and related entities. The Blue Air Pleadings show that Blue Air planned a surprise

5

attack on the Debtors' principals for more than two months. As early as August 10, 2011, Blue Air was attempting to build a case against the Debtors and related parties.

11. Blue Air's duplicitous behavior came to light in a meeting on October 21, 2011—ostensibly called to discuss a myriad of business details—that in reality was set up as an ambush of the Debtors' principals (the "October 21 Meeting"). Blue Air intentionally called the October 21 Meeting without notice to the Debtors' attorneys. The Debtors' principals received an agenda circulated on behalf of Blue Air by Geoffrey Curme in advance of the October 21 Meeting that listed topics related to the plans for the Debtors' exit from bankruptcy. Blue Air's principals, Curme, Doug Stephan and Paul Picarazzi, attended the October 21 Meeting. At the outset of that meeting, Blue Air accused the Debtors' principals of fraud and misrepresentations. Blue Air then demanded that the Debtors' principals agree to commit certain acts on behalf of the Debtors, the Debtors' principals and related entities by 2 p.m. on Sunday, October 23, 2011, or face disclosure of the alleged fraud. Blue Air refused, however, to significantly detail for the Debtors' principals what the grounds were for Blue Air's allegations during the October 21, 2011 Meeting.

12. The Debtors' principals were instructed not to disclose to the contents of the October 21 Meeting to Debtors' counsel until after they had acquiesced to Blue Air's demands. Blue Air assured the Debtors' principals that if they acceded to Blue Air's demands and signed a "settlement agreement" to that effect, Blue Air would not mention the alleged fraud or misrepresentations to the Court or to Debtors' counsel. The Debtors' principals viewed these demands as blackmail and an attempt to deceive Debtors' counsel as well as the Court.

13. The October 21 Meeting reflected Blue Air's attempt to make an "offer" to the Debtors' principals that they could not refuse. However, the Debtors' principals contacted

6

Debtors' counsel immediately after leaving the October 21 Meeting and revealed the set-up that Blue Air had staged.

14. Its offer having been refused, on Sunday, October 23 between 4 and 6 p.m., Blue Air filed the Blue Air Pleadings. Therefore, as with all the Blue Air Pleadings, Blue Air only brought the Trustee Motion after having failed to force a "settlement" with the Debtors' principals that would have resulted in stripping the Debtors of their assets as well as in Blue Air capturing assets owned by the Debtors' principals and related entities—a result that which would have unjustly enriched Blue Air.

15. Since the Debtors filed the Plan, Blue Air has been intimately involved in the Debtors' operations. Blue Air has approved leases, arranged to install JLL as the EpiCentre's manager, and has been actively involved in virtually every decision as to payments made on the Debtors' behalf. Blue Air has arranged for JLL to hire contractors to perform certain improvements at the EpiCentre. Blue Air's principals have, up until the October 21 Meeting, demanded of the Debtors and their counsel that certain actions be taken, motions be filed and the like. Blue Air has, in short, been overseeing each decision made by the Debtors, and in many cases, directing those decisions, in a manner close to domination and control. For these reasons, the Trustee Motion is simply not supported by the facts.

This is the 27th day of October, 2011.

*/s/ A. Cotten Wright*
Joseph W. Grier, III (State Bar No. 7764)
A. Cotten Wright (State Bar No. 28162)
GRIER FURR & CRISP, P.A.
101 North Tryon Street, Suite 1240
Charlotte, N.C.  28246
(704) 375-3720
(704) 332-0215 (fax)
jgrier@grierlaw.com
cwright@grierlaw.com

# UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# Charlotte Division

| | |
|---|---|
| **In re:** | **CASE NO. 10-32093** |
| **Pacific Avenue, LLC, et al.,** | **CHAPTER 11** |
| **Debtors.** | **Jointly Administered** |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing *Debtors' Response to Motion of Blue Air 2010 LLC for Order to Appoint a Chapter 11 Trustee for Limited Purposes* was served via electronic service on counsel for Blue Air 2010, LLC and other counsel who have appeared in this case.

This the 27th day of October, 2011.

*A. Cotten Wright*
A. Cotten Wright
GRIER FURR & CRISP, PA
101 N. Tryon St., Ste. 1240
Charlotte, NC  28246

8